IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|   |   |
|---|---|
| ROSEBUD ENTERTAINMENT, LLC, | * |
| Plaintiff, | * |
| v. | * |
| PROFESSIONAL LAMINATING LLC, et al., | * CIVIL NO.: WDQ-12-0425 |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Rosebud Entertainment, LLC ("Rosebud") sued Professional Laminating LLC ("Professional Laminating"),[1] William Oertel, and Barbara Oertel (collectively, the "Defendants") for copyright infringement, trademark infringement, and other claims. For the following reasons, Rosebud's motion for partial summary judgment will be denied.

I. Background[2]

  A. The Parties

Rosebud[3] publishes, markets, sells, and distributes *Baltimore* magazine, a subscription-based monthly periodical that

---

[1] Professional Laminating operates under the trade name "Professional Recognition Products." ECF No. 29 at 3.

[2] In reviewing a motion for summary judgment, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

has "celebrat[ed]" Baltimore since 1907. Iglehart[4] Aff. ¶¶ 3-4. Rosebud is the sole owner of all copyrights in the magazine's published issues, "which issues, including the covers, Rosebud has filed for registration." Iglehart Aff. ¶¶ 5-6. Rosebud also manufactures plaques containing articles and images from *Baltimore* magazine; Rosebud's profit on each plaque sold is $90.00. Rosebud's Answer to Interrog. Nos. 2, 6.

Professional Laminating[5] advertises, designs, manufactures, and sells customized plaques containing pages from newspaper and magazine articles, at the request of individuals and entities featured in the articles. Defs.' Answer to Am. Compl. ¶¶ 2, 16. The Oertels are North Carolina citizens and the sole members[6] of Professional Laminating. *See id.* ¶ 3; Prof'l Laminating Answer to Interrog. No. 1.

B. Factual Background

This case arises out of Professional Laminating's use--in advertisements (the "Advertisements") and products--of the covers to *Baltimore* magazine's November 2010 and 2011 issues

---

[3] A Maryland limited liability company. Am. Compl. ¶ 1.

[4] "Iglehart" is Ken Iglehart, *Baltimore* magazine's Director of Design and Print Division and Managing Editor of Special Editions. Iglehart Aff. ¶ 2.

[5] A North Carolina limited liability company. Defs.' Answer to Am. Compl. ¶ 2.

[6] William Oertel is the company's manager and executive. Prof'l Laminating Answer to Interrog. No. 1.

(the "Works"). ECF No. 25 ¶ 1; see Defs.' Answer to Am. Compl. ¶¶ 22, 31. The Works' covers, featuring "Top Doctors," depicted University of Maryland Hospital for Children Pediatric Oncologist Teresa York and Northwest Hospital's Chief of Minimally Invasive Surgery W. Peter Geis, respectively. ECF No. 25, Exs. E, F. Images of the covers are prominently featured in the Advertisements, next to other images designed by Professional Laminating. See ECF No. 25, Exs. B, C.[7]

The Advertisements were mailed to each of the doctors listed in the relevant issue one month after the issue was published. See Prof'l Laminating Answer to Interrog. No. 5. About 20 plaques and three crystal display pieces were manufactured and sold "using"[8] the Works' covers. Id. No. 7.[9]

---

[7] Barbara Oertel created the Advertisements by photoshopping images of the Works' covers into a general template. Prof'l Laminating Answer to Interrog. Nos. 6, 9. (Photoshop is an Adobe graphics software package that allows a user to create drawings on a drawing window on a computer screen. *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 18 (Fed. Cir. 2000).) Barbara and William Oertel mailed the Advertisements. Prof'l Laminating Answer to Interrog. No. 9.

[8] The Defendants used original covers from *Baltimore* magazines, as well as copies of the covers, to create the plaques. William Oertel Aff. ¶ 2. The Defendants only used copies of the covers to fit the crystal display pieces, which were smaller than the original periodical. Id. ¶ 3.

[9] William Oertel "generally" manufactured the plaques and crystals. Prof'l Laminating Answer to Interrog. No. 9. He created the plaques by laminating the magazine covers, with the selected background color, onto pieces of wood. Id. No. 8. To

According to the Defendants, "[m]ost of the orders received for the Baltimore Magazine Top Doctor Issue were for [their] own designs." William Oertel Aff. ¶ 2. The Defendants charged $129 per item, from which they realized a profit of $38.70. Prof'l Laminating Answer to Interrog. No. 13. The Defendants were aware that the Works were copyrighted. Id. Nos. 10, 11.

C. Procedural History

On February 10, 2012, Rosebud filed suit against the Defendants for copyright infringement and other claims. ECF No. 1. On March 29, 2012, the Defendants answered the complaint. ECF No. 9. On March 30, 2012, the Court entered a scheduling order. ECF No. 11. On July 31, 2012, the case was referred to U.S. Magistrate Judge Stephanie A. Gallagher for discovery. ECF No. 14. On September 26, 2012, the case was referred to U.S. Magistrate Judge Susan K. Gauvey for a settlement conference. ECF No. 19.[10] Also on September 26, Rosebud filed a consent motion for leave to amend the complaint. ECF No. 20. The motion for leave to amend was granted--and the amended complaint was filed--on September 27, 2012. ECF Nos. 21, 22.[11] The

---

create the display crystals, the cover image was inserted into the crystal. Id.

[10] The case was later reassigned to then-Senior U.S. District Judge Benson Everett Legg. See docket. The conference did not result in a settlement. See ECF No. 35.

[11] The amended complaint alleged four causes of action:

4

Defendants answered the amended complaint on October 5, 2012. ECF No. 23.

On October 24, 2012, Rosebud moved for summary judgment as to liability on its copyright infringement claims (in Counts One and Four), with damages to be determined at trial. ECF No. 25 ¶¶ 3-4.[12] On November 29, 2012, the Defendants timely opposed the motion. ECF No. 29; see ECF No. 28. On January 11, 2013, Rosebud timely replied. ECF No. 34; see ECF No. 33.

II. Analysis

A. Legal Standard

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

(1) Copyright infringement, against Professional Laminating (Count One);
(2) Trademark infringement, against Professional Laminating (Count Two);
(3) Unfair competition, against Professional Laminating (Count Three); and
(4) Vicarious liability for copyright and trademark infringement, against the Oertels (Count Four).

ECF No. 22 ¶¶ 35-55.

[12] In addition to seeking summary judgment, Rosebud requests the Court to: (1) permanently restrain the Defendants from infringing Rosebud's copyrights in *Baltimore* magazine; (2) order that all copies of material appearing in *Baltimore* magazine, which the Defendants have reproduced or transferred onto "any physical medium" without Rosebud's authorization, be delivered to Rosebud or destroyed; and (3) require the Defendants to file a written report documenting their compliance with the foregoing injunctive relief. ECF No. 25 at 2.

matter of law." Fed. R. Civ. P. 56(a).[13] In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted). A party opposing summary judgment "may not rest upon the mere allegations or denials of [his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 525.

---

[13] Rule 56(a), which "carries forward the summary-judgment standard expressed in former subdivision (c)," changed "genuine 'issue' [to] genuine 'dispute,'" and restored the word "'shall' . . . to express the direction to grant summary judgment." Fed. R. Civ. P. 56 advisory committee's note.

B. Rosebud's Motion for Partial Summary Judgment

Rosebud argues that it is entitled to summary judgment as to liability for copyright infringement, because it owned a valid copyright upon which the Defendants directly (Professional Laminating) and vicariously (the Oertels) infringed. ECF No. 25-1 at 5. The Defendants concede that "there might have been some small minor technical violation of copyright law," but argue that, "to the extent that there may be a technical copyright infringement," it is "a minor part of what Defendant sells." ECF No. 29 at 3-4. The Defendants note that they "never intended to violate or infringe on Plaintiff's copyright." *Id.* at 4.

The Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.*, protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102. A copyright holder has exclusive rights to use--and authorize the use of--his work in five ways: (1) to reproduce the work; (2) to prepare "derivative"[14] works; (3) to distribute copies of the work to the public; (4) to perform the work publicly; and (5) to display the work publicly. *Id.* § 106; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432-33 (1984). Thus, to prove

---

[14] The Copyright Act defines "derivative work" as "a work based upon one or more preexisting works, such as a[n] . . . art reproduction . . . or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.

7

copyright infringement, the plaintiff must demonstrate that: (1) he owned the copyright to the work that was allegedly copied, and (2) the defendant copied "protected elements of the work." *Bouchat v. Balt. Ravens, Inc.*, 241 F.3d 350, 353 (4th Cir. 2001).

Rosebud asserts that "undisputed facts" establish it owns valid copyrights in the Works, and the Defendants directly infringed its exclusive rights to reproduce copies, prepare derivative works, and distribute copies by producing the Advertisements and manufacturing the plaques and crystal displays. ECF No. 25-1 at 5-9.[15] The Defendants admit that *Baltimore* magazine was copyrighted by Rosebud and that the Advertisements, plaques, and crystals copied protected elements of the magazine. *See* ECF No. 29 at 3-4.[16] They argue, however,

---

[15] Rosebud further argues that the Oertels are vicariously liable for the infringement, because they supervised, and benefited financially from, the infringing activities. *Id.* at 9; *see Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 513 (4th Cir. 2002).

[16] There is ample authority that magazine covers are entitled to copyright protection. *See, e.g., Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 806 (D.C. Cir. 1987) (although no element of magazine cover--ordinary lines, typefaces, and colors--is entitled to copyright protection, the distinctive arrangement is entitled to protection as a graphic work), *disagreed with on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 521 n.8 (1994); *Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 422 (E.D. Pa. 2009) (defendant conceded that copyrighted magazine covers "fall within the core of the Copyright Act's protective purposes since they are creative expressions"); *Conde Nast Publ'ns, Inc. v. Vogue Sch.*

8

that they should not be held liable for infringement, because there are genuine disputes of material fact about whether their use of the copyrighted Works was "fair" and/or permissible under the "first sale" doctrine. *Id.* at 7, 12.

1. Fair Use

Copyright owners' exclusive rights are subject to statutory exceptions, including § 107's exception for "fair use." *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003). "Fair use is a complete defense to infringement." *Bouchat v. Balt. Ravens Ltd. P'ship*, 619 F.3d 301, 307 (4th Cir. 2010). In other words, "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. Congress "meant § 107 to restate the present judicial doctrine of fair use . . . and intended that the courts continue the common-law tradition of fair use adjudication." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (internal quotation marks omitted). Accordingly, the doctrine constitutes "an equitable rule of reason, for which no generally applicable definition is

---

*of Fashion Modeling, Inc.*, 105 F. Supp. 325, 332 (S.D.N.Y. 1952) (the plaintiff "devoted much money and effort to the preparation of each cover as one of the most significant features of its magazines," resulting in "an artistic composition, demonstrating originality and good taste [that was] distinctive of plaintiff's magazine and the product of its labor").

possible." *Sundeman v. Seajay Society, Inc.*, 142 F.3d 194, 202 (4th Cir. 1998) (internal quotation marks omitted).[17]

Section 107's factors "guide the determination" of whether a particular use is "fair." *Bond*, 317 F.3d at 394. The factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The factors are not to "be treated in isolation," but "[a]ll are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

### a. Purpose and Character of the Use

In applying the first factor, courts consider "whether and to what extent the new work is 'transformative'": i.e., "whether the new work merely supersedes the objects of the original creation" or "instead adds something new, with a further purpose or different character." *Campbell*, 510 U.S. at 579 (internal quotation marks omitted). Although transformative use is not "absolutely necessary" for a finding of fair use, the goal of

---

[17] *See also* Campbell, 510 U.S. at 577 (the fair use inquiry is "not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis").

copyright--to promote science and the arts--is "generally furthered by the creation of transformative works." *Id.*

Here, Professional Laminating's use of the Works is only minimally transformative: as the Defendants admit, they created the products by laminating magazine covers onto pieces of wood and, with respect to the crystals, by shrinking and inserting copies of the covers into the material. Prof'l Laminating Answer to Interrog. No. 8. Indeed, the Defendants concede that the "nature" of their products is "to showcase the original copyrighted material." ECF No. 29 at 14; *see id.* (describing the plaques as "another form of framing with a name tag"). Further, the Defendants earned a profit of $38.70 for each item sold. Prof'l Laminating Answer to Interrog. No. 13. Such commercial use of copyrighted material is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of Am.*, 464 U.S. at 451.[18] The minimally transformative character and commercial

---

[18] *See also Conde Nast Publ'ns*, 105 F. Supp. at 333 ("[N]o one is entitled to save time, trouble and expense by availing himself of another's copyrighted work for the sake of making an unearned profit." (internal quotation marks omitted)).

The Defendants erroneously rely on *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171 (5th Cir. 1980), to insist that the first factor weighs in favor of fair use. *See* ECF No. 29 at 9. In *Triangle*, the court considered a television commercial in which the *Miami Herald* displayed a cover of the copyrighted magazine, *TV Guide*, for purposes of comparing it to its own analogous publication. 626 F.2d at 1172-73. The Fifth Circuit observed that the cover of *TV Guide*

purpose of the Defendants' Advertisements and products weigh against a finding of fair use.

### b. Nature of the Copyrighted Work

In considering the second factor, courts are "most receptive to unauthorized use of educational, scientific, and historical works." *Triangle*, 626 F.2d at 1176. Further, the law "generally recognizes a greater need to disseminate factual works than works of fiction or fantasy . . . . [and] [t]he scope of fair use is also narrower with respect to unpublished works." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563-64 (1985). "Creative works and unpublished works are closer to the core of works protected by the Copyright Act." *Sundeman*, 142 F.3d at 204.

*Baltimore* magazine features news stories about prominent people, arts, culture, and sports in the city. *About Us*, Baltimore, http://www.baltimoremagazine.net/contact/about (last visited July 19, 2013). The November 2010 and 2011 issues of *Baltimore* magazine were not only published, but also possess

---

was clearly copyrighted, and the *Herald* had reproduced it for a commercial purpose: to sell its own product. *Id.* at 1173-74. However, the court found that the reproduction was a fair use. *See id.* at 1178. With respect to the first factor, the court noted the public benefit of "comparative advertising" as a means of providing more information to the public, and concluded that this factor weighed in the defendant's favor. *See id.* at 1175-76. Here, the Defendants did not use the covers for comparative advertising; instead, they incorporated them into decorative objects which infringed Rosebud's copyright. Thus, *Triangle*'s analysis does not apply here.

significant educational and factual attributes. At most, the Works are a combination of factual and creative. These considerations weigh in favor of finding fair use.

    c. Amount and Substantiality of the Portion Used

The third factor considers the amount and substantiality of the portion used by the alleged infringer in relation to the copyrighted work as a whole. 17 U.S.C. § 107(3). "To state it simply, the more the defendant takes of the plaintiff's work, the less likely it is that the taking will qualify as fair use." *Bouchat v. NFL Props. LLC*, 910 F. Supp. 2d 798, 805 (D. Md. 2012). Here, the Defendants used the Works' covers and copies of the covers. *See* ECF No. 25, Exs. B, C. This use of the Works is probably insubstantial compared to the copyrighted Works as a whole, each of which contained roughly 275 pages. *See* Rosebud's Answer to Interrog. No. 2.[19] Thus, the third factor also favors a finding of fair use.

    d. Effect of the Use on the Potential Market

The fourth factor--addressing the "effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4)--is "undoubtedly the single most important

---

[19] Rosebud argues that the Defendants "stole" an "integral" part of the magazine, because magazine covers "create[] the 'buy impulse.'" ECF No. 34 at 7, 8. The Court does not agree that a magazine cover is the "heart" of a periodical that includes hundreds of pages of articles and photographs. *Campbell*, 510 U.S. at 587-88.

element of fair use." *Sundeman*, 142 F.3d at 206. Three subsidiary considerations bear noting. First, "[a] use that does not 'materially impair' marketability of the copyrighted work generally will be deemed fair." *Id*. Another "key" consideration is whether the allegedly infringing work is a "market substitute" for the copyrighted work. *Id*. at 207.[20] Finally, a court should consider the potential "impact" of the allegedly infringing uses on the market for derivatives of the copyrighted work. *Id*. "The market for potential derivatives includes those uses that the copyright holder of the original work would develop or license others to develop." *Id*.

As previously stated, the Defendants' Advertisements and products did not contain entire issues of *Baltimore* magazine, but rather depicted two issues' cover pages. The Court cannot conclude, on these facts, that this use *materially* impaired marketability of the Works, acted as a substitute for them in the market, or significantly affected the market for derivative works.

---

[20] *See also New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493 (S.D.N.Y. 1988) (the fair use doctrine protects against republication that offers the copyrighted work "in a secondary packaging," such that "potential customers, having read the secondary work, will no longer be inclined to purchase again something they have already read."), *aff'd*, 873 F.2d 576 (2d Cir. 1989), *cert. denied*, 493 U.S. 1094 (1990).

14

e. Resolution

Analysis of the four statutory factors reflects--at the very least--a genuine dispute of material fact about whether the Defendants' use of the Works was "fair" and thus noninfringing. Summary judgment will be denied on this ground.

2. First Sale Doctrine

The first sale doctrine, like fair use, is an exception to copyright owners' exclusive rights. The doctrine is set forth in 17 U.S.C. § 109(a), which provides, in relevant part:

> (a) Notwithstanding the provisions of section 106(3) [the section that grants the owner exclusive distribution rights], the owner of a particular copy or phonorecord lawfully made under this title, . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

Otherwise stated, "once a copy of [a copyrighted work] has been lawfully sold (or its ownership otherwise lawfully transferred), the buyer of that *copy* and subsequent owners are free to dispose of it as they wish. In copyright jargon, the 'first sale' has 'exhausted' the copyright owner's § 106(3) exclusive distribution right." *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1355 (2013) (emphasis in original). Thus, a library may lend an authorized copy of a book that it lawfully owns without violating copyright laws. *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997). "[B]y its terms, § 109(a) has no application

to the other four rights of a copyright owner, [such as] the right to perform the work publicly." *Red Baron-Franklin Park, Inc. v. Taito Corp.*, 883 F.2d 275, 280 (4th Cir. 1989).

It is undisputed that the Defendants' Advertisements and crystal display pieces contained copies--not the original pages --of Rosebud's magazine covers. Prof'l Laminating Answer to Interrog. Nos. 6, 9; William Oertel Aff. ¶¶ 2-3. By the statute's express terms, the "first sale" doctrine does not apply to the Defendants' use of such reproductions. 17 U.S.C. § 109(a); *see Kirtsaeng*, 133 S. Ct. at 1355; *Red Baron-Franklin Park, Inc.*, 883 F.2d at 280. The Defendants argue that the doctrine applies to the plaques that *did* contain the original covers. *See* ECF No. 29 at 12-14. Specifically, the Defendants contend that--because the plaques were not "independent works of art," but rather consisted of "the same exact work placed on a different background"--they effectively resold copies of the Works lawfully acquired. *See id.* at 14 (internal quotation marks omitted). Rosebud objects that the Defendants' efforts "transform[ed] . . . a magazine into a commemorative product through the tearing, laminating, and framing of the magazine's cover onto a plaque inscribed with a recognition of the doctor featured in the magazine." ECF No. 34 at 12.

The Fourth Circuit does not appear to have decided whether a commemorative plaque is, as a matter of law, a "first sale"

16

under § 109(a) or a derivative work protected by § 106(2). Other courts are divided on the issue. *Compare Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1444, 1451 (11th Cir. 1998) (first sale doctrine permitted defendant to purchase trading cards and, without altering the cards "in any way," frame them by mounting individual cards between a transparent acrylic sheet and wooden board), *and Lee v. Deck the Walls, Inc.*, 925 F. Supp. 576, 577, 583 (N.D. Ill. 1996) (first sale doctrine permitted defendant to purchase notecards and, after trimming the card images, to adhere the cards to a ceramic tile and cover the image with a clear epoxy resin), *aff'd sub nom. Lee v. A.R.T. Co.*, 125 F.3d 580 (7th Cir. 1997), *with Greenwich Workshop Inc. v. Timber Creations, Inc.*, 932 F. Supp. 1210, 1215 (C.D. Cal. 1996) (defendants' practice of removing from plaintiff's copyrighted book reduced-scale versions of plaintiff's copyrighted artwork, which were intended solely for inclusion in the book, infringed plaintiff's copyrights).

Here, unlike in *Allison* and *Lee*, the Defendants have done more than add surrounding materials to Rosebud's Works; instead, they significantly altered the Works by physically separating the magazine covers from the magazines and cutting the cover pages to fit the wooden boards. *See* Prof'l Laminating Answer to Interrog. Nos. 8, 9. Because of these alterations to the original Works, the first sale doctrine does not apply to any of

17

the Defendants' products--including those that contained original pages.

III. Conclusion

For the reasons stated above, Rosebud's motion for partial summary judgment will be denied.

_7/24/13_
Date

_/s/ William D. Quarles_
William D. Quarles, Jr.
United States District Judge